IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| GS2 Engineering & Environmental Consultants, Inc., | ) ) ) | C/A No. 3:12-cv-02934-CMC |
| Plaintiff, | ) ) | |
| vs. | ) ) | OPINION AND ORDER |
| Zurich American Insurance Company and Steadfast Insurance Company, | ) ) ) | ON CROSS MOTIONS FOR SUMMARY JUDGMENT |
| Defendants. | ) ) | |
| _____ | ) ) | |
| Zurich American Insurance Company and Steadfast Insurance Company, | ) ) ) ) | |
| Counterclaim-Plaintiffs, | ) ) | |
| vs. | ) ) | |
| GS2 Engineering & Environmental Consultants, Inc., | ) ) ) | |
| Counterclaim-Defendant. | ) ) | |
| _____ | ) | |

This insurance coverage dispute is before the court on cross motions for summary judgment. The issues central to both motions are whether: (1) Zurich American Insurance Company ("Zurich") may be held responsible for providing coverage based on Zurich's status as parent company of the entity that wrote the policies (Steadfast Insurance Company ("Steadfast")); (2) the policies at issue (claims-made-and-reported policies) may be construed to cover a claim made against the insured during one policy period and reported to the insurer during a subsequent period covered by a policy renewal; and (3) the policies otherwise exclude coverage due to one or more policy provisions. For

reasons set forth below, the court resolves all issues in Defendants' favor, denies Plaintiff's motion, and grants Defendants' motion in full.[1]

## STANDARD

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987). The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

In the present case, the parties agree that there are "no material facts in dispute. The only dispute is the interpretation of the insurance contract." *See* Dkt. No. 34 at 2 (Plaintiff's memorandum in opposition to Defendants' motion); *see also* Dkt. No. 32 at 2 n.2 (Defendants' memorandum in opposition to Plaintiff's motion stating "it does not appear that the parties . . . disagree about the relevant facts and timing of the events relevant to this case").

---

[1] All issues are resolved by applying South Carolina law, which the parties agree controls despite the inclusion of a contrary choice of law provision in the policy. *See* Dkt. No. 40 at 2 (response to question no. 1, noting S.C. Code Ann. § 38-61-10 mandates application of South Carolina law).

**FACTS**

The critical and undisputed facts are as follows. Plaintiff, GS2 Engineering & Environmental Consultants, Inc. ("GS2"), was covered under a series of insurance policies issued by Defendant Steadfast Insurance Company ("Steadfast"). Dkt. No. 31-4 at 3-4 (Affidavit of Ann Marie Forte ¶¶ 8, 13). Steadfast is a subsidiary of Zurich and utilizes Zurich's logo on various documents including some pages of its policies and correspondence relating to the claim at issue. *See*, *e.g.*, *id.* ¶¶ 9, 10; Dkt. No. 31-4 at 12 (declaration page indicating issuance by "Steadfast Insurance Company" but also bearing Zurich logo and indicating all notices should be sent to "Zurich North America- Specialties Environmental Claims"). The individual who handled the claim describes herself as "Claims Counsel in the Environmental Division for various Zurich companies, including Steadfast." Forte aff. ¶ 6.[2]

The first policy which Steadfast issued to GS2 covered the period August 7, 2005, to August 7, 2006. *Id.* ¶ 8. The policy was renewed annually for a total of six one-year policy periods, with the last renewal policy ending on August 7, 2011. *Id.* ¶ 13. For purposes of this action, the critical policies are the last two renewal policies, which covered the periods August 7, 2009, to August 7,

---

[2] Although the court ultimately concludes that there is no legal basis for holding Zurich responsible for any obligations imposed on the insurer under the Steadfast policies, it notes that Forte appears to have contributed to the confusion over which entity is responsible. For example, Forte avers that, after she became aware of the claim, she asked GS2's attorney to advise her "if GS2 Engineering was tendering the . . . claim to *Zurich*." Forte aff. ¶ 24 (emphasis added). She also avers that the attorney, thereafter, "formally tendered the . . . matter to *Zurich*. *Id.* ¶ 25 (emphasis added). She again refers to Zurich, as if it is the responsible insurer, when she states (incorrectly) that GS2 "did not advise *Zurich* of the . . . claim at any time during the [2010 Policy Period]." *Id.* ¶ 38 (emphasis added).

3

2010 ("2009 Policy"), and August 7, 2010, to August 7, 2011 ("2010 Policy").[3] The parties agree that the last two policies were the same in all material respects. Dkt. No. 40-2 (response to question no. 2).

The 2009 Policy and 2010 Policy covered claims made and reported during the relevant policy period subject to a retroactive date of August 7, 1998. *See id.* ¶ 11 (addressing nature of policies); Dkt. No. 31-4 at 31 (retroactive date endorsement for policy for last policy period); *see also* Dkt. No. 40 at 2 (Joint Supplemental Brief agreeing that policies for last two policy periods did not differ in any material respect).[4]

The 2009 and 2010 Policies addressed the claims-made-and-reported requirement in their introductory paragraphs as follows:

> This is a claims made and reported policy. . . . This policy has certain provisions and requirements unique to it and may be different from other policies an "insured" may have purchased. . . . Words and phrases that appear in quotations have special meaning. Refer to DEFINITIONS (Section VIII).
>
> "Claims" must first be made against the "insured" during the "policy period" and "claims" must be reported, in writing, to us during the "policy period", the automatic extended reporting period or the extended reporting period, if applicable.

Dkt. No. 31-4 at 14.

The coverage provisions of these policies also explained that coverage was provided for claims arising from specified services, when the following criteria were met:

---

[3] Forte avers that the only policy at issue in this action is the 2010 policy. Forte aff. ¶ 18. This is a conclusion of law rather than a statement of fact. The court, therefore, gives the statement no weight.

[4] The "retroactive date" is defined as "the earliest date that a 'professional service ' or 'covered operation' can commence for coverage to be provided under the policy[.]" Dkt. No. 31-4 at 26. *See also* Dkt. No. 31-4 at 31 (consistent definition in endorsement).

4

> [S]uch act, error or omission must commence on or after the "retroactive date" and before the end of the "policy period" and the "claim" is first made against the "insured" during the "policy period" and reported to us during the "policy period", the automatic extended reporting period or the extended reporting period, if applicable.

Dkt. No. 31-4 at 14 ("Professional Liability Coverage" provision); *see also id.* (substantially the same requirements under the "Contractor's Pollution Liability" provision). "Policy Period" is defined as the period specified on the declarations page. Dkt. No. 31-4 at 26 (Policy § VIII. R.).[5]

The policies' extended reporting period ("ERP") provisions read as follows:

> IV.  EXTENDED REPORTING PERIOD
>
> > A.  You shall be entitled to an automatic extended reporting period without additonal charge upon termination of coverage as defined in this section. This period starts at the end of the "policy period" and lasts for thirty (30) days.
> >
> > B.  In addition to the automatic extended reporting period you shall be entitled to purchase an extended reporting period of up to three (3) years in duration upon termination of coverage as defined in this section . . .
> >
> > * * *
> >
> > E.  For the purposes of this automatic extended reporting period and the Extended Reporting Period endorsement, termination of coverage means any cancellation or nonrenewal of this policy except for fraud or material misrepresentation, a material change in the nature or extent of the risk or nonpayment of premium.

Dkt. No. 31-4 at 18-19.

GS2 received the claim that is at issue in this action no later than April 14, 2010, when its attorney accepted service of a lawsuit filed by Richland School District Two ("Richland Two"). Forte aff. ¶ 20. At the time GS2 accepted service, nearly four months remained in the 2009 Policy

---

[5] The declarations page of the 2010 Policy reflects a policy period of August 7, 2010, to August 7, 2011. The 2009 Policy would, therefore, have had a policy period of August 7, 2009, to August 7, 2010.

5

Period. GS2 did not, however, take action to inform Steadfast of the claim before the 2009 Policy expired and the 2010 Policy went into effect on August 7, 2010.

Steadfast received its first notice of the suit on September 23, 2010, roughly 47 days into the 2010 Policy Period. Forte aff. ¶ 21. This notice was provided by counsel for Richland Two, rather than by GS2. *Id.* (referring to receipt of courtesy copy of summons and complaint against GS2). GS2 first communicated with Steadfast regarding the claim on November 12, 2010. *Id.* ¶ 22. This communication responded to an October 6, 2010, inquiry from Steadfast regarding its receipt of the summons and complaint from Richland Two. *Id.* n.4. Thus, GS2 did not both receive and report the claim during the same policy period.[6]

Because GS2 renewed its policy, it was not eligible either for the automatic (thirty-day) ERP or purchase of a longer ERP.[7] GS2 would not, in any event, be benefitted by the automatic ERP as it did not report the claim within the first thirty days following the end of the 2009 policy period.

## DISCUSSION

As noted above, Defendant Zurich seeks summary judgment on the grounds that it is merely Steadfast's parent company and did not issue the policies in question. This argument is addressed in Section I. below.

---

[6] Forte avers that the claim was *neither* made nor reported during the 2010 Policy Period. Forte aff. ¶ 29; *see also id.* ¶ 38 (stating GS2 "did not advise Zurich of the . . . claim at any time during the [2010 Policy Period]"). The parties agree that this statement is incorrect as the claim was made during the 2009 Policy Period and reported during the 2010 Policy Period. Dkt. No. 40 at 3 (response to question no. 3).

[7] Forte avers that "GS2 Engineering failed to afford itself of the opportunity to purchase and did not purchase an extended reporting period of up to three (3) years in duration upon termination of coverage." Forte aff. ¶ 17. In this regard, Forte appears to refer to GS2's actions at the conclusion of the 2010 Policy Period, after which it changed to another insurer. The statement would have no relevance to GS2's actions at the conclusion of the 2009 Policy Period as it was ineligible for either benefit given its renewal of the policy.

In addition, both Defendants move for summary judgment on the grounds that GS2's claim was not made and reported during the same policy period. GS2, in contrast, seeks summary judgment on the grounds that the multiple policy periods formed a single period of continuous coverage which, together with the language of the ERP, should be construed in favor of the insured to require coverage. These arguments are addressed in Section II below.

Defendants also argue for summary judgment based on additional policy provisions. These arguments are addressed in Section III, below.

**I.     Zurich's Responsibility**

Zurich seeks summary judgment on grounds it did not write the policies at issue in this action. Instead, the policies were written by Steadfast, Zurich's wholly owned subsidiary. Zurich argues that there are no other grounds on which to hold it liable for whatever obligations may exist under the policies.

GS2 responds that "Zurich has been involved in this matter since the beginning[,]" noting the presence of the Zurich logo on the policies' declaration pages and endorsements, the reference to Zurich in the address to be used for notices, and the use of Zurich letterhead by Defendants' claim representative, Forte. Dkt. No. 34 at 12. GS2 also notes that "South Carolina courts ascribe to the alter-ego theory of parent and subsidiary corporations . . . [as] a way to pierce the corporate veil." *Id.* at 11. GS2, nonetheless, concludes that it "merely wants an insurer which will honor the terms of the contract." *Id.* at 12. Thus, if "Steadfast admits it is the party liable on the insurance contract, GS2 will not need to retain Zurich as a defendant." *Id.*[8]

---

[8] *See also* Dkt. No. 40 at 18 (GS2's response to court's inquiry stating that Zurich should be dismissed if Steadfast "admits that (1) it issued the policy and (2) *if coverage is proper*, it is liable on the policy") (emphasis added).

7

The confusion as to which company is responsible is understandable given the communications between the parties. *See, e.g.*, Forte aff. ¶¶ 24, 25, 38. There is, however, no evidence that Zurich wrote the policies at issue in this action. Neither is there any evidence that Steadfast has denied that it is responsible for any claim covered by the policies (though it denies that the claim at issue falls within the scope of coverage). Finally, while GS2 notes the theoretical availability of a veil-piercing claim, it has not proffered any evidence which might support recovery on this basis. Zurich is, therefore, entitled to summary judgment that it has no obligation to GS2 regardless of the interpretation of the policies.

**II.     Time for Reporting Claim**

Defendants argue, correctly, that the basic nature of claims-made-and-reported policies requires that claims be *both* made against the insured and reported to the insurer during the same policy period. *See*, *e.g.*, Dkt. No. 31-1 at 11-17 (citing multiple cases for this proposition). The reporting period may, however, be expanded by contractual terms such as those found in the ERP included in many such policies. *Id.*

The introductory language in the policies issued to GS2 disclosed these requirements and noted that they might be different from other policies the insured had purchased.

> This is a claims made and reported policy. . . . This policy has certain provisions and requirements unique to it and may be different from other policies an "insured" may have purchased. . . . *"Claims" must first be made against the "insured" during the "policy period" and "claims" must be reported, in writing, to us during the "policy period", the automatic extended reporting period or the extended reporting period, if applicable*.

Dkt. No. 31-4 at 14 (emphasis added). The policies' relevant coverage provisions, likewise, provided that coverage applied only if the "the claim is first made against the insured during the policy period and reported to us during the policy period, the automatic extended reporting period or the extended

8

reporting period, if applicable." *Id.* (Professional Liability Coverage provision) (quotation marks omitted); *see also id.* (Contractor's Pollution Liability provision) (essentially the same).

The question here is not how these requirements operate as a general rule. It is, instead, how they operate where the insured is covered under a series of renewed policies that contain extended reporting period provisions that are not available in the event of renewal.

GS2 relies on two decisions which found claims covered under claims-made-and-reported policies despite the insureds' failure to report the claim during the same policy period in which it was made. In both decisions, the courts found the policy language ambiguous, construed the language in favor of the insured, and held that renewal of the particular policies before the court resulted in an extension of the reporting period from one policy year into subsequent year(s).

The earlier of the two decisions, *Helberg v. Nat'l Union Fire Ins. Co.*, 657 N.E.2d 832 (Ohio 1995), concluded that an extended reporting period ("ERP") that was available only in the event of cancellation or nonrenewal, thus unavailable in the event of renewal, did "not deny coverage in th[e] context" of a claim made during one policy period and reported during the next (renewed) policy period. The court found this conclusion supported by an expectation of continuous coverage created by language found in a preexisting condition exclusion. *Id.* at 834 (referring to exclusion which precluded coverage of claims arising prior to the first policy period "and continuously renewed thereafter"). *Id.* at 834. The court explained as follows:

> This language indicates that the parties expected coverage to be continuous if the policy was renewed at each successive policy expiration. Taken in conjunction with [the section requiring reporting during the policy period or during an extended reporting period], this element of the contract contributes to the ambiguity of when a claim must be reported. Thus, the contract should be construed in favor of . . . the insured.

*Id.*[9]

The majority in *AIG Domestic Claims, Inc. v. Tussey*, 2010 WL 3603844 (Ky. Ct. App. 2010), *review granted* (Sep. 14, 2011), reached the same conclusion as to the policy there at issue.[10] Relying on *Helberg*, the *AIG* court held that "the more sensible interpretation of [a contract with an ERP that was not available on renewal,] is that because the [ERP] provision sets forth only two circumstances when the purchase of an extension is necessary to maintain coverage, the renewal of the policy provides a continuation of coverage and the purchase of an extension is unnecessary." *Id.* at *3. In reaching this conclusion, the Kentucky court construed the policy in favor of the insured. *Id.* at *2 (noting "it is a fundamental rule of construction in the Commonwealth that insurance policies are to be liberally construed, with any doubts resolved in favor of the insured").

A dissenting judge, after noting that the majority opinion might, "[a]t first blush, . . . have intuitive appeal," concluded that the extension of the reporting period was unwarranted because it would provide . . . an unbargained for tail of liability exposure. *Id.* at *5 (also noting that the circumstances did not warrant an equitable extension of the reporting deadline as the claim was not received late in the covered period). The dissent noted that the majority of cases confronting similar

---

[9] Unlike the policies in *Helberg*, the policies at issue in this case do not have any provisions referring to "continuous renewals." Most critically, the preexisting condition exclusions in the Steadfast policies refer only to events predating the "inception date of the policy." Dkt. No. 31-4 at 15. Inception date is not a defined term and appears to be used only once in the body of the policy. *See* Dkt. No. 40 at 4-5 (responding to court's request for either a policy definition or " policy . . . language which may aid in interpreting the meaning of this term"). The term is used again in the endorsement titled "Minimum Earned Premium at Inception," in a manner that is consistent only with a reference to the commencement of individual policy periods: "this policy has a minimum earned premium at *inception* of 25.00%." Dkt. No. 31-4 at 27 (emphasis added).

[10] Information available on Westlaw reveals that the Kentucky Supreme Court granted discretionary review of this decision on September 2011. That review appears to remain pending.

issues had found an absence of coverage. *Id.* (citing *Helberg* and *Cast Steel Products, Inc. v. Admiral Ins. Co.*, 348 F.3d 1298 (11th Cir. 2003), as cases representing the minority position and distinguishing *Cast Steel* based on the promptness with which the eleventh-hour claim was reported to the insurer).[11]

Defendants cite multiple cases in support of the contrary position: that renewal of a claims-made-and-reported policy does not modify the requirement that claims be reported in the same policy period in which they are received unless a ERP applies. *See*, *e.g.*, Dkt. No. 40 at 5-17 (discussing cases involving renewal policies and ERPs). For example, in *Checkrite Ltd., Inc. v. Illinois Nat. Ins. Co.*, 95 F. Supp. 2d 180 (S.D.N.Y. 2000), the district court held that ERP language similar to that found in the policies at issue in this case did "not support a reading into the contract of an 'inherent' extended reporting period in the event of renewal." *Id.* at 193 (predicting New York law based on a perceived majority view). As here, the insured in *Checkrite* received the claim in one policy period but did not report it until after the policy was renewed, thus in a subsequent policy period. The court held that the claim was not covered because the "conceptual framework [applicable to claims-made-and-reported policies] applies where a policy is renewed, as well as when it is not, since each policy year represents an agreement as to a specific period during which claims made and reported will be covered." *Id.* at 194. The *Checkrite* court conceded the intuitive appeal of the insured's position,

---

[11] The parties do not cite or address *Cast Steel*. The court has, nonetheless, carefully considered it as the only federal appellate decision addressing whether renewal of a claims-made-and-reported policy extends the time for reporting a claim into a subsequent policy period. Ultimately, the court finds *Cast Steel*'s minimal analysis unpersuasive as it appears to have followed *Helberg* based on a generalized notion of fairness, rather than based on analysis of the language in the policy before the court. *See id.* at 1304 (quoting *Helberg* in support of the following rationale: "[I]f choosing to cancel or non-renew provided the insured with an extended reporting period, electing to continue to do business with the same insurer by renewing the claims-made policy certainly 'should not precipitate a trap wherein claims spanning the renewal are denied.'")

11

but rejected it, noting that there was "a rationale for providing [an ERP] option only in the case of cancellation or nonrenewal[,]" because "[a]n insured who cancels or does not renew faces a risk of coverage gaps that can result from switching to an occurrence policy or to another claims-made policy." *Id.* at 193 (citing *Ehrgood v. Coregis Ins. Co.*, 59 F. Supp. 2d 438 (M.D. Pa. 1998) (discussed below)). The circumstances addressed in *Checkrite* do not appear to be distinguishable from the circumstances in the present action.

Defendants also rely on *Ehrgood v. Coregis Ins. Co.*, 59 F. Supp. 2d 438 (M.D. Pa. 1998), which excluded coverage under two sequential policies for different but related reasons. The insureds first received notice of the potential claim during the 1996-1997 policy period but did not report the claim to the insurer until the 1997-1998 policy period (during which the claim was also actually made). The court held that the report was late with respect to the noticed potential claim because the ERP provisions did not apply in the event of policy renewals. Despite acknowledging the "first blush . . . intuitive appeal" of the insureds' argument, the court held that allowing coverage would "ignore[] the nature of the policy at issue" because "the notice, or reporting period, in a claims made policy defines coverage[.]" *Id.* at 446. The court also noted that the "1996-1997 policy provided [plaintiffs] sixty days after the end of the policy period in which to report any claims or potential claims, thereby protecting them against 'eleventh hour' claims filed toward the end of the policy period." *Id.* at 447 (noting there was "nothing in the insurance policy or in the course of their dealings . . . which would have led [plaintiffs] to believe they had a longer period of time.").

The *Ehrgood* court also held the claim could not be covered under the subsequent 1997-1998 policy, even though the actual claim was received during that policy period, because of a prior knowledge exclusion. *Id.* at 444. In reaching this conclusion, the court rejected an argument that

12

the claim should be covered because the 1997-1998 policy was a renewal policy (with notice of the claim having been received in the prior policy year). In addition to noting the different time periods covered by each policy, the court noted that each policy had a different policy number, different premiums were charged for each policy, and the insurer required "detailed information [for each of the] policy renewal applications and claim information supplement forms." *Id.* The court found these factors "clearly evince[d] an intent to create three separate policies as opposed to one continuous policy."[12]

This court finds the reasoning in *Checkrite* and *Ehrgood* persuasive as they better reflect the nature of the policies at issue and their actual language.[13] The court further concludes that the South Carolina Supreme Court would apply this reasoning to exclude coverage under the facts of this case and language of the present policy, which clearly and repeatedly advises that coverage requires a claim to be made and reported during the same policy period. Any ambiguity which might be found in the ERP, when read in isolation, is clarified by the language found in the introductory and basic coverage provisions quoted above. The policy even alerts the insured that such terms "may be different from other policies an 'insured' may have purchased." Dkt. No. 31-4 at 14.

---

[12] Defendants address several additional cases involving belatedly reported claims under similar policies. All conclude that renewal does not modify the reporting requirement, although only some address the possible impact of an ERP. *See Koransky, Bouwer & Poracky, P.C. v. Bar Plan Mut. Ins. Co.*, 712 F.3d 336 (7th Cir. 2013); *Murray Architects, Inc. v. Scottsdale Ins. Co.*, 2011 WL 5878148 (E.D. La. Nov. 23, 2011), Pantropic Power Products, Inc. v. Fireman's Fund Ins. Co., 141 F. Supp. 2d 1366 (S.D. Fla. 2001), *aff'd* 34 Fed. Appx 968 (11th Cir. 2002); *Goings & Goings, Inc. v. U.S. Risk, Inc.*, 2005 WL 3320863 (Cal. Ct. App. Dec. 8, 2005) (unpublished, non-citable opinion).

[13] As noted above, the *Helberg* court relied, in part, on continuous renewal language found in the preexisting condition exclusion which has no counterpart in the policies at issue here.

13

Even if the court were to find the ERP provisions in the Steadfast policies ambiguous, it would, at most, construe them to extend the automatic thirty-day ERP to renewed policies. Under the facts of this case, that would not lead to a different result as the claim was first reported to the insurer more than thirty-days after the close of the 2009 Policy Period, which is the policy period in which the claim was made.

In sum, the court adopts the reasoning in *Checkrite* and *Ehrgood*, and rejects GS2's arguments that all policies should be treated as a single continuous policy or the reporting period for the 2009 Policy should be extended into the 2010 Policy Period. The court, therefore, denies Plaintiff's motion for summary judgment and grants Defendants' motion to the extent they seek judgment that the claim at issue is not covered under the 2009 Policy due to belated reporting of the claim.

### III. Defendants additional arguments

Defendants also argue that the claim is excluded: (1) under the specific "pollution liability" provisions of the policy because the claim was made "four months or so before the Steadfast Policy went into effect"; and (2) by the "pre-existing condition" exclusion. Dkt. No. 31-4 at 22-25. Both of these argument necessarily relate to coverage under the 2010 Policy given that the claim was, in fact, received by GS2 during the 2009 Policy Period.

It is undisputed that the claim was received by GS2, thus "made" during the 2009 Policy year. No argument suggests a basis for disregarding the requirement that the claim be made during the relevant policy year. It follows, therefore, that Defendants are entitled to summary judgment that the claim is not covered under the 2010 Policy for this reason.

**CONCLUSION**

For the reasons set forth above, the court denies Plaintiff's motion and grants Defendants' motion in full.

IT IS SO ORDERED.

                                              s/ Cameron McGowan Currie
                                              CAMERON MCGOWAN CURRIE
                                              UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
July 9, 2013